UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| KATHRYN M. McCASKILL, as Successor in Interest to Jayne K. Marso, | 4:17-CV-04121-KES |
| Plaintiff, | REPORT AND RECOMMENDATION |
| vs. | |
| NANCY A. BERRYHILL,[1] Deputy Commissioner for Operations, performing the duties and functions not reserved to the Commissioner of Social Security, | |
| Defendant. | |

**INTRODUCTION**

Plaintiff, Kathryn M. McCaskill as Successor in Interest to Jayne K.

Marso,[2] seeks judicial review of the Commissioner's final decision denying

_____

[1] Nancy Berryhill is no longer the Acting Commissioner of Social Security. The revised title is necessary until the President appoints another executive to serve as Acting Commissioner, or there is a nominee for the position of Commissioner of Social Security, at which time the Federal Vacancies Reform Act of 1998, 5 U.S.C. § 3346(a)(2), would allow Nancy Berryhill to resume the position of Acting Commissioner of Social Security while the nomination is pending.

[2] Because the medical and other administrative SSA records, the ALJ, and the Appeals Council all refer to Ms. Marso as the applicant for benefits, this court in this opinion will likewise, when applicable, refer to Ms. Marso as the plaintiff even though her daughter, Ms. McCaskill, has stepped into her place for purposes of pursuing Ms. Marso's posthumous entitlement to benefits.

Jayne K. Marso's application for social security disability and supplemental security income disability benefits under Title II of the Social Security Act.[3] Ms. McCaskill has filed a complaint and has requested the court to reverse the Commissioner's final decision denying Ms. Marso disability benefits and to enter an order awarding benefits. Alternatively, Ms. McCaskill requests the court remand the matter to the Social Security Administration for further proceedings.

This appeal of the Commissioner's final decision denying benefits is properly before the district court pursuant to 42 U.S.C. § 405(g). This matter was referred to this magistrate judge pursuant to 28 U.S.C. § 636(b) and the February 27, 2018, order of the Honorable Karen E. Schreier, district judge.

---

[3]SSI benefits are sometimes called "Title XVI" benefits, and SSD/DIB benefits are sometimes called "Title II benefits." Receipt of both forms of benefits is dependent upon whether the claimant is disabled. The definition of disability is the same under both Titles. The difference –greatly simplified--is that a claimant's entitlement to SSD/DIB benefits is dependent upon one's "coverage" status (calculated according to one's earning history), and the amount of benefits are likewise calculated according to a formula using the claimant's earning history. There are no such "coverage" requirements for SSI benefits, but the potential amount of SSI benefits is uniform and set by statute, dependent upon the claimant's financial situation, and reduced by the claimant's earnings, if any. There are corresponding and usually identical regulations for each type of benefit. See e.g. 20 C.F.R. § 404.1520 and § 416.920 (evaluation of disability using the five-step procedure under Title II and Title XVI). In this case, Ms. Marso filed her application for both types of benefits. AR256-59; 247-55. Her coverage status for SSD benefits expired on March 31, 2016. AR14. In other words, in order to be entitled to Title II benefits, Ms. McCaskill must prove Ms. Marso became disabled on or before that date.

2

**FACTS[4]**

**A.    Statement Of The Case**

This action arises from Ms. Marso's application for SSDI and SSI benefits filed June 8, 2012, alleging disability since April 7, 2012, due to arthritis/osteoarthritis, lupus, thyroid problems, Sjogren's disease, left knee injury, lower back disc bulge, compression and fracture, disc degeneration, chronic pain from neck to lower back, osteoporosis, torn ligament in right arm, vulvodynia, impaired concentration, focus and memory, severe bone and joint pain, swelling, rashes, headaches, impaired sleep, blurred vision, extreme fatigue, nervousness, and anxiety.  AR132-33, 247, 256, 294, 303, 308-09. Ms. Marso's claim was denied initially and again upon reconsideration and Ms. Marso requested an administrative hearing on September 19, 2012. AR166, 172, 179, 184, 189.

Ms. Marso's hearing was held 28 months later on January 23, 2015, where different counsel than current counsel represented her.  AR31.  An unfavorable decision was issued on March 6, 2015, by Administrative Law

_____

[4] These facts are gleaned primarily from the detailed factual recitation contained in Ms. McCaskill's memorandum (Docket 11).  The Commissioner did not recite a  factual background in her memorandum nor did she specifically dispute any of Ms. McCaskill's facts, but instead "incorporated" the medical and vocational facts recited in the ALJ's decision, found at AR 13-21. The court will therefore refer as necessary to the pertinent facts relied upon by the Commissioner in discussing the errors Ms. McCaskill asserts were made by the Commissioner.

Judge Hortensia Haaverson ("ALJ").  AR10.  At step one of the evaluation,[5] the

ALJ found that Ms. Marso had not engaged in substantial gainful activity since

April 7, 2012, the alleged onset of disability date.  AR15.  At step two, the ALJ

found that Ms. Marso had severe impairments of takotsubo cardiomyopathy,

lupus, Sjogren syndrome, and hypothyroidism.  AR16.  The ALJ also found

that Ms. Marso had a medically determinable impairment of depression, but

found that it was not severe because Ms. Marso had only mild restrictions in

activities of daily living, social functioning, and in maintaining concentration,

persistence or pace.  AR16.  The ALJ did not mention any other impairment at

step two.  AR16-17.  At step three, the ALJ found that Ms. Marso did not have

an impairment or combination of impairments that met one of the listed

impairments in 20 C.F.R. 404, Subpart P, Appendix 1.  AR17.

The ALJ determined that Ms. Marso had residual functional capacity

("RFC") to perform light work except:

> She can lift and carry 20 pounds occasionally and 10 pounds
> frequently.  She can sit, stand, or walk for six hours in an eight-
> hour workday (based on the opinion of State agency (DDS) medical
> consultant Christina Rodriguez, M.D. dated September 7, 2012 at
> Exhibit B7A, p. 12).  She can sit no more than one hour at a time;
> and she can stand or walk no more than 15 minutes at one time
> before she needs to change positions, but can continue working.
> She requires a cane for ambulation.

AR17.  The ALJ found that Ms. Marso's allegations regarding intensity,

persistence and limiting effects of her symptoms were "partially credible for the

---

[5] The Social Security regulations set forth a sequential method of
evaluating disability claims.  20 C.F.R. § 404.1520(b); 20 C.F.R. § 416.920.

4

reasons explained in this decision." AR19.  The ALJ determined at step four that Ms. Marso was capable of performing her past relevant work as a user support analyst, a skilled occupation with a specific vocational requirement (SVP) level of 7, based on the RFC and the testimony from the vocational expert, and the claim was denied.  AR20-21.

Ms. Marso then timely requested review of the denial by the Appeals Council on April 29, 2015.  But, on July 1, 2016,  while waiting for the Appeals Council to act, she died.  AR9, <u>see</u> death certificate attached to Docket No. 11, showing death due to cardiomyopathy, nonischemic, July 19, 2013; lupus, 2013; hypothyroidism, 2010; and stroke, 2013.  The Appeals Council denied review on August 18, 2016, making the ALJ's decision the final decision of the Commissioner.  AR3.  On October 13, 2016, Ms. Marso's prior counsel requested an extension of time to file a civil action in order to determine a successor in interest to Ms. Marso's claim, which the Appeals Council granted on July 30, 2017.  AR1-2.  Ms. Marso's daughter, Ms. McCaskill, was determined to be the proper successor in interest to Ms. Marso's claim and Ms. McCaskill timely filed this action.  20 C.F.R. § 404.503(b).

## B.    Plaintiff's Age, Education and Work Experience

Ms. Marso was born on October 28, 1968, making her 43 years old at the time of her alleged onset of disability (April 7, 2012), 46 years old at the time of the decision, and 47 years old at her death.  AR256, <u>see</u> death certificate attached to Docket 11.  The disability report indicated Ms. Marso completed two years of college in 1994.  AR295.  The ALJ found that Ms. Marso's past

relevant work consisted of the occupations of user support analyst, computer support specialist, and teacher-aide-I.[6]  AR20.

## C.    Relevant Medical Evidence

### 1.    Orthopedic Treatment Records

Ms. Marso received treatment from the Joint Implant Surgeons of Florida, which document problems with her left knee beginning with arthroscopy of the knee on December 5, 2006, and continued treatment into 2007 where the April 12, 2007, treatment note references Ms. Marso was also being treated for lupus.  AR362, 365.  Ms. Marso also received treatment there for her right hip with a February 21, 2008, diagnosis of right pelvic trigger point.  AR359.  Ms. Marso continued to have left knee symptoms and received an Orthovisc injection on May 8, 2008, for left knee osteoarthritis.  AR357. Ms. Marso was seen on August 28, 2008, when her knee gave out and she fell and injured her wrist. AR356.  The treatment note referenced that Ms. Marso was receiving Enbrel[7] injections for her lupus at that time.  AR356.  Ms. Marso continued to receive treatment on her knee and the record indicated that

_____

[6] Ms. Marso's work as a teacher-aide does not appear to be a full-time job, rather one part of a composite job (see SSR 82-61), and as such is not past relevant work.  AR 35-36, 38-41, 277-78.  However, this disputed finding does not appear relevant to the current issues because the ALJ found Ms. Marso could only perform her past work as a user support analyst at step four.

[7] Enbrel is a tumor necrosis factor blocker used to treat rheumatoid arthritis, psoriatic arthritis, or ankylosing spondylitis, to prevent joint damage caused by those conditions.  See https://www.drugs.com/enbrel.html.

6

surgery was discussed on February 16, 2009, but Ms. Marso did not want

surgery.  AR354.

Ms. Marso also received treatment at Orthopedic Specialists of Southwest

Florida around this time and was seen on September 28, 2008, for neck pain

when an MRI revealed degenerative changes at C5 to C7, as well as disc

protrusions and bulges, without cord compression.  AR383.  Surgical treatment

was discussed in light of the consideration that her healing may be slowed

down because of her lupus and prednisone and methotrexate periodic

treatments.  AR384.  By January 6, 2009, conservative treatment had not

helped and Ms. Marso elected to proceed with surgery and a C5-C6 cervical

diskectomy and fusion was performed on January 8, 2009.  AR381, 385.

Ms. Marso's medical impressions at that time included lupus, ankylosing

spondylitis,[8] and Hashimoto's thyroiditis.  AR389.  On March 20, 2009,

---

[8] Ankylosing spondylitis is an inflammatory disease that, over time, can
cause some of the vertebrae in your spine to fuse. This fusing makes the spine
less flexible and can result in a hunched-forward posture. If ribs are affected, it
can be difficult to breathe deeply.
  Ankylosing spondylitis affects men more often than women. Signs and
symptoms typically begin in early adulthood. Inflammation also can occur in
other parts of your body — most commonly, your eyes.
  There is no cure for ankylosing spondylitis, but treatments can lessen
your symptoms and possibly slow progression of the disease.
  Symptoms
  Early signs and symptoms of ankylosing spondylitis might include pain
and stiffness in your lower back and hips, especially in the morning and after
periods of inactivity. Neck pain and fatigue also are common. Over time,
symptoms might worsen, improve or stop at irregular intervals.
  The areas most commonly affected are:
  •The joint between the base of your spine and your pelvis (sacroiliac)

Ms. Marso was seen after being in an automobile accident and had discomfort

in the neck, but the graft, plates and screws from the prior surgery at C5-C6

_____

•The vertebrae in your lower back
•The places where your tendons and ligaments attach to bones (entheses), mainly in your spine, but sometimes along the back of your heel
•The cartilage between your breastbone and ribs
•Your hip and shoulder joints
Causes
Ankylosing spondylitis has no known specific cause, though genetic factors seem to be involved. In particular, people who have a gene called HLA-B27 are at greatly increased risk of developing ankylosing spondylitis. However, only some people with the gene develop the condition.
Risk factors
•Your sex. Men are more likely to develop ankylosing spondylitis than are women.
•Your age. Onset generally occurs in late adolescence or early adulthood.
•Your heredity. Most people who have ankylosing spondylitis have the HLA-B27 gene. But many people who have this gene never develop ankylosing spondylitis.
Complications
In severe ankylosing spondylitis, new bone forms as part of the body's attempt to heal. This new bone gradually bridges the gap between vertebrae and eventually fuses sections of vertebrae. Those parts of your spine become stiff and inflexible. Fusion can also stiffen your rib cage, restricting your lung capacity and function.
Other complications might include:
•Eye inflammation (uveitis). One of the most common complications of ankylosing spondylitis, uveitis can cause rapid-onset eye pain, sensitivity to light and blurred vision. See your doctor right away if you develop these symptoms.
•Compression fractures. Some people's bones thin during the early stages of ankylosing spondylitis. Weakened vertebrae can crumble, increasing the severity of your stooped posture. Vertebral fractures can put pressure on and possibly injure the spinal cord and the nerves that pass through the spine.
•Heart problems. Ankylosing spondylitis can cause problems with your aorta, the largest artery in your body. The inflamed aorta can enlarge to the point that it distorts the shape of the aortic valve in the heart, which impairs its function.
https://www.mayoclinic.org/diseases-conditions/ankylosing-spondylitis/symptoms-causes/syc-20354808 (last accessed April 20, 2018)

were intact.  Ms. Marso was seen again on April 3, 2009, due to low back pain following the automobile accident and prescribed physical therapy and anti-inflammatories.  AR377.  When Ms. Marso did not improve a lumbar MRI was obtained on April 23, 2009, which revealed no fractures, but showed a lesion at L5 and spondylolysis and bulging at L5 that could result in bilateral L5 symptoms; lumbar injections were given.  AR368, 370, 376.

Ms. Marso was also receiving physiatric treatment during this time at Athletic Orthopedics and Reconstructive Center where she was seen on September 12, 2008, for neck, shoulder, knee, hip and elbow problems.  AR418.  Examination revealed spasming of the cervical muscles and the right hand side levator scapula, and tenderness in all 18 triggerpoint locations.  AR420.  The physiatrist suspected that the majority of Ms. Marso's pain was from lupus with likely a coexisting fibromyalgia syndrome and administered trigger point injections; however, the injections caused more pain.  AR416, 421.  On March 5, 2009, after her neck surgery Ms. Marso was seen again primarily for ongoing knee pain and an MRI was obtained of her knee, which revealed a tear or scuffing along the medical meniscus.  AR413-14, 423.  Conservative treatment was attempted, then injections on May 11, 2009, and August 7, 2009, were administered.  AR410, 412.

In 2010 and 2011, Ms. Marso received treatment from the Joint Implant Surgeons of Florida for a torn left hamstring, a fractured left clavicle, and a subsequent additional shoulder injury.  AR543, 557.  She also received treatment for her right elbow on August 29, 2011, due to a spontaneous

9

rupture of the right lateral epicondylar muscular structure. AR542. An MRI of the elbow revealed medial and lateral epicondylitis of the elbow, and her elbow was injected on October 20, 2011. AR537, 539-40.

Ms. Marso received treatment from The Spine Center where she was seen on June 14, 2010, for follow-up of her low back pain and she had responded well to prior epidural injections, but by November 30, 2010, she continued to require ongoing NSAIDs so another epidural was administered on December 14, 2010. AR616, 618-19. Ms. Marso returned on December 12, 2011, and had been doing well until two weeks earlier when she began having non-stop severe low back pain. AR614. She had been receiving treatment for ankylosing spondylitis and receiving hydrocodone. AR614. Ms. Marso's hydrocodone was continued with a plan for an epidural injection when she could afford to pay for it. AR614. Ms. Marso continued to be maintained on hydrocodone resulting in moderate lumbar pain level through June 2012. AR611, 613.

Ms. Marso was seen at The Spine Center on June 26, 2012, complaining of excruciating neck pain extending into the right arm with burning, numbness, and tingling, and had not responded to prednisone treatment. AR609. X-rays revealed the prior fusion and obvious anterior spurring below C6-7, and examination revealed Ms. Marso was in clear distress with tenderness to palpation, somewhat positive impingement signs, positive

Spurling's testing,[9] some mild sensory deficits in the medial biceps region on the right, and decreased grip strength on the right.  AR609, 620.  A cervical MRI was indicated but Ms. Marso could not afford it and an epidural injection was given.  AR608-09.  When seen for follow-up her pain had improved by 75%, although she continued to have numbness in digits 1 and 2 of the right hand, but no further follow-up or diagnostic evaluation was recommended due to Ms. Marso's lack of insurance and she was continued on gabapentin and hydrocodone.  AR664, 666.  When seen for follow-up on December 4, 2012, Ms. Marso reported that her overall pain was still quite severe, worse with activities, but overall stable with the medications.  AR683.

---

[9] The Spurling test helps to diagnose cervical radiculopathy. It's also called the Spurling compression test or Spurling maneuver.

Cervical radiculopathy occurs when a nerve in your neck is pinched near the area where it branches away from your spinal cord. Several things can cause this, including a herniated disc or degenerative changes that happen naturally as you age. Common symptoms include pain, weakness, or numbness in your arm or hand muscles. You might also feel pain across your upper back, shoulders, or neck.

The Spurling test will help your doctor check for cervical radiculopathy and rule out any other causes of your pain.

The Spurling test is done while you're sitting down, either in a chair on an exam table.

There are several variations of the test, but the most common ones are Spurling test A and Spurling test B.

Spurling test A

Your doctor will bend your head toward the side of your body where you have symptoms. They'll then apply some pressure to the top of your head.

Spurling test B

In addition to bending your head toward your symptomatic side, your doctor will extend and rotate your neck while applying pressure to the top of your head.

https://www.healthline.com/health/spurling-test#techniques (last accessed April 20, 2018).

Ms. Marso continued to be seen at The Spine Center for follow-up and on February 21, 2013, reported chronic cervical and lumbar pain with some radiculopathy to her buttocks bilaterally, and that her pain had begun to escalate about six weeks earlier.  AR681.  Examination revealed positive straight leg raise tests bilaterally, positive facet loading maneuver, somewhat decreased range of motion in the lumbar spine, and some guarding of the left lower extremity with a slight left limp.  AR681-82.  Ms. Marso's hydrocodone was increased and an epidural offered but she could not afford it.  AR679, 682.

### 2.    Lee Physicians Group Records

#### a.    Primary Care - Dr. Waks

Ms. Marso received her primary care treatment as well as some specialty treatment at Lee Physicians Group.  Ms. Marso was seen by a nurse practitioner on June 15, 2010, for hyperlipidemia.  AR600-01.  Ms. Marso reported fatigue, myalgia, back pain, joint swelling, and arthralgias and headaches. AR601.  The record indicated that she was being followed by Dr. Bustillo and Dr. Augusty for her history of ankylosing spondylosis and had been receiving epidural injections.  AR601.  An October 13, 2008, overview by Dr. Bustillo documented functional deficits, pain, fatigue, and morning stiffness due to ankylosing spondylitis.  AR599.  Ms. Marso saw Dr. Waks on September 15, 2010, to follow-up regarding her multiple joint pains and fatigue.  Ms. Marso reported that the Enbrel was helping and activity helped but it resulted in soreness the next day.  AR591-92.  Ms. Marso's fingers were swollen and she had pain in the low back and hip, sporadic numbness in her

left toe, and she reported fatigue.  AR592.  Ms. Marso's medications at that time included hydrocodone, trazodone, tramadol, prednisone, methotrexate,[10] flector patches, and weekly Enbrel injections.  AR594-95.

Dr. Waks saw Ms. Marso on October 11, 2011, and she continued to have joint pain, swelling and inflammation which were being followed by Dr. Bustillo.  AR582-83. Ms. Marso had stopped Enbrel and started plaquenil[11] in June, but it was less effective and her soreness had increased.  AR583.  She had also fractured her left clavicle in April and continued to have pain and weakness, and was seeing Dr. Creech for skin rash on her arms and legs. AR583.  Her lipid tests continued to not meet goal.  AR584.

Ms. Marso saw Dr. Waks on January 13, 2012, for a new onset of right shoulder pain and saw him again on June 22, 2012, for right shoulder pain with pain into her neck/back muscles with paresthesias down the arm into the last two fingers, but she felt it was unrelated to her neck/cervical pain.  AR574. Ms. Marso was seeing pain management and rheumatology specialists, and

-------------------

[10] Trexall® (methotrexate tablets USP) (formerly Amethopterin) is an antimetabolite used in the treatment of certain neoplastic diseases, severe psoriasis, and adult rheumatoid arthritis. https://www.rxlist.com/trexall-drug.htm (last accessed April 20, 2018).

[11] Plaquenil (generic name: Hydroxychloroquine) is used, usually with other medications, to treat certain auto-immune diseases (lupus, rheumatoid arthritis) when other medications have not worked or cannot be used. It belongs to a class of medications known as disease-modifying antirheumatic drugs (DMARDs). It can reduce skin problems in lupus and prevent swelling/pain in arthritis, though it is not known exactly how the drug works.

had some tears in her elbow shown on MRI a few months prior. AR574. Examination revealed decreased range of motion and tenderness in the right shoulder with strength diminished on her right side, and she was prescribed prednisone for ulnar nerve entrapment and advised to follow-up with her orthopedic doctor. AR575-76. "NCV"[12] was to be held off due to lack of insurance. AR576.

Ms. Marso saw Dr. Waks on August 1, 2013, for hospital follow-up after having severe left ventricular impairment with akinesia of the anterior, apical and distal inferior wall consistent with Takotsubo cardiomyopathy with a left ventricle ejection fraction in the range of 20% and having had a stroke on July 24, 2013. AR863. Ms. Marso was having palpations and complained of shortness of breath, and jaw pain due to her fall from her syncopal event, and she was very anxious. AR865. She was following with Dr. Butler for her cardiomyopathy and lorazepam was prescribed. AR866.

Ms. Marso switched her primary care to the Lee Physicians Group – United Way North clinic after losing her health insurance on August 27, 2013. AR1219; see http://www.wecareforlee.org/ (low fee or no fee clinic). Ms. Marso reported symptoms of depression, fatigue, feeling cold, neck stiffness, and back pain and arthralgias. AR1217-18. Examination revealed decreased range of motion and pain in her cervical and lumbar back and several lupus lesions in

---

[12] Because of the context, the court believes the reference to "NCV" in this medical record refers to nerve conduction velocity.

various stages of healing.  AR1218.  Future referrals were planned for cardiology, mental health, and physical therapy for her cardiomyopathy, anxiety, depression, and pain.  AR1220.

Ms. Marso was seen on September 16, 2013, for follow-up on low back pain and reported her pain as sharp, shooting, constant pain in the low back without radiation.  AR1196.  Ms. Marso reported increased symptoms with sitting, standing, and walking, and had been avoiding activities and had tried physical therapy which helped with her upper back but increased the pain in her lower back.  AR1196.  A future referral to pain management was planned. AR1198.

Ms. Marso was seen on October 7, 2014, for her ongoing problems and right rib pain.  AR1109.  An x-ray obtained in August had not shown a rib fracture, but with continuing symptoms a recent x-ray revealed a fracture of the 7th rib.  AR1109, 1358 (x-ray).  She had been off her thyroid medication since July 1, 2014, and reported increased dry skin and fatigue.  AR1109. Compression was discussed as an option for pain management of the rib fracture, but it was decided with her immunosuppressed state and weakness to continue without compression.  AR1109.

### b.  Rheumatology - Dr. Bustillo

Ms. Marso was seen by Dr. Bustillo on August 13, 2010, to follow-up on her ankylosing spondylitis ("AS") and reported fatigue, back pain, no joint swelling and arthralgia, but was having difficulty with activities of daily living. AR805.  Her AS was clinically stable with very minimal stiffness, fatigue was

15

the same, she was following with pain management and her medications were continued. AR806. Her medications included flexeril, trazodone, hydrocodone, and Enbrel injections. AR806-10. Ms. Marso saw a PA on November 10, 2010, and her AS continued stable with occasional stiffness in her neck and hands, and Enbrel and her pain medications were continued. AR796. Ms. Marso saw Dr. Bustillo on February 9, 2011, and reported fatigue, mild back pain, stiffness and difficulty with walking. AR785. Examination revealed tenderness in her hips and lumbar back, and her medications were continued. AR785-86.

Ms. Marso continued to follow with Dr. Bustillo for her AS and when seen on August 15, 2011, her Enbrel was stopped due to an ongoing rash. AR765. When Ms. Marso saw Dr. Bustillo on October 18, 2011, she reported increased symptoms including pain in her thoracic and lumbar spine, fatigue, and difficulty walking and getting dressed. AR754. She had been off Enbrel for eight weeks but her rash continued. AR755. By November 29, 2011, when she was seen her pain was worse, and she had stiffness of the lumbar spine and hips with morning stiffness lasting 45 minutes; plaquinel had been prescribed. AR744. Examination revealed tenderness in her hips and lumbar back and decreased range of motion. AR744. Prednisone was prescribed in addition to the plaquinel, and Dr. Bustillo concluded that the Enbrel may have caused a lupus like skin reaction, since her skin had finally improved. AR745. Ms. Marso saw Dr. Bustillo on February 29, 2012, complaining of fatigue, pain in her back, knees, and right shoulder, and reported difficulty walking, getting dressed, bathing, doing housework, laundry and shopping. AR734.

16

Examination revealed tenderness and reduced range of motion in her shoulder and she was unable to obtain the needed MRI due to lack of insurance. AR735.  She continued to be off immunomodulators and was taking tramadol and flexeril.  AR735.

When Ms. Marso was seen on May 29, 2012, she had been started on plaquinel, which Dr. Bustillo said she was tolerating and doing well on, but also noted chronic degenerative joint disease with her AS symptomology and Ms. Marso continued to report difficulty walking and dressing.  AR724-25. When seen on September 28, 2012, she continued to have chronic degenerative joint disease with her AS symptomology and Ms. Marso continued to report difficulty walking and dressing.  AR724-25.  When seen on September 28, 2012, she continued to have chronic back pain, dry mouth and dry eyes, but her functioning was adequate and her plaquinel, tramadol and flexeril were continued.  AR715.  Dr. Bustillo mentioned potential testing due to her sicca or Sjogren's symptoms, but the tests were expensive and she had no insurance and the symptoms could have been caused by her AS, thyroid and medications she was taking.  AR715.

Ms. Marso saw Dr. Bustillo on February 14, 2013, and reported dry mouth, fatigue, a lot of stiffness in her back, hips and difficulty functioning with increased symptoms since being off Enbrel.  AR702.  Examination revealed tenderness in her hips and back and decreased range of motion in her lumbar back.  AR702.  Dr. Bustillo indicated she was off Enbrel because she had no insurance, and continued her plaquinel and tramadol, changed her

17

flexeril to zanaflex and added salagen for dry mouth.  AR703.  Ms. Marso was seen on May 23, 2013, and had been started on a 90-day trial of twice weekly Enbrel injections and reported feeling better, but Ms. Marso continued to report significant problems doing her ADLs, laundry, cooking and shopping, and examination continued to show tenderness and decreased range of motion in her back. AR691-92.

Dr. Marso saw Dr. Bustillo on August 22, 2013, following hospitalization for emotional cardiomyopathy, and continued to report ongoing arthralgias, back stiffness and problems with bathing, housework, laundry and shopping, AR1255.  Weekly Enbrel injections and tramadol were continued and Xanax was prescribed.  AR1256.  On November 26, 2013, Ms. Marso was seen and reported fatigue, weight gain, and feeling cold all over but no significant back pain and Dr. Bustillo felt her AS was stable and the current symptoms were likely from her hypothyroid being adjusted.  AR1240-41.  The last treatment record in the appeal record from Dr. Bustillo was on December 1, 2014, and Ms. Marso reported that for weeks she had had arthralgias, myalgias, back pain and weakness in her arms that may have coincided with stopping plaquinel.  AR1078.  Dr. Bustillo noted proximal arthralgias, myalgias, but no weakness on exam, and ordered blood tests, which were normal and prescribed prednisone.  AR1080, 1082.

### c.    Pain Management – Dr. Mahaney

Ms. Marso received pain management treatment from Dr. Mahaney and nurse practitioners supervised by Dr. Mahaney.  A lumbar MRI was obtained

on October 4, 2013, which revealed broad based bulging at L2-3 and L3-4,

facet joint hypertrophy at L2-3, 3-4 and 4-5.  AR1367-68.  Ms. Marso received

an epidural injection on October 9, 2013, and again on December 10, 2013.

AR1371, 1374.

Ms. Marso was seen on March 5, 2014, for follow-up for cervical and low

back pain.  AR1290.  Her prior treatment (epidural injection on December 10,

2013 – AR1299, 1374) had reduced the pain by at least 50% for six weeks.

AR1290.  Examination revealed decreased range of motion, tenderness, pain,

and spasm in the cervical back and similar findings in the lumbar back.

AR1292.  Cervical epidurals were given due to Ms. Marso's reduced level of

functioning because of her chronic pain.  AR1294.  Dr. Mahaney also

recommended exercise and walking be increased to continue to explore non-

medication based options for pain control.  AR1294, 1377.

Ms. Marso continued to have similar symptoms and examination findings

and received additional treatments due to her reduced functioning caused by

chronic pain including, caudel epidural injection for lumbar pain and

hydrocodone on April 2, 2014, (AR1300-03); lumbar caudel epidural injections

on May 7, 2014, (AR1305-09, 1380); continued hydrocodone on June 11, 2014,

and August 13, 2014, (AR1314-18, 1320-24); epidural injections on August 27,

2014, (AR1326-32, 1383); continued hydrocodone and voltaren topical gel on

September 24, 2014, (AR1335-40); and an additional epidural on October 10,

2014 (AR1342-47, 1386).  Ms. Marso also received an intercostals block at T5-

19

6, 6-7 due to a fractured rib on November 5, 2014. AR1349-50, 1389.  A bone scan obtained on October 10, 2014, also revealed osteopenia.  AR1364.

### 3. Hospital Admission and Cardiology Records

Ms. Marso was admitted to the hospital from July 12, 2013 to July 24, 2013, for syncopal episodes where she felt dizzy and then passed out.  AR814.  A witness to one episode described her as shaking, kind of staring into space, and being unresponsive for a minute or so.  AR814.  An echocardiogram was performed which indicated her ejection fraction was 60% but a cardiac catheterization revealed severe left ventricular dysfunction with actual ejection fraction of 20% with possible Takotsubo cardiomyopathy.[13]  AR820, 1424, 1432-33.  Later hospital records also indicated that Ms. Marso had a small cardioembolic cerebrovascular accident (CVA) or stroke at the time of the cardio catheterization on July 20, 2013, shown by MRI.  AR910, 920, 924.  Ms. Marso had been started on coumadin and had nonsustained ventricular tachycardia (NSVT), she had been started on amiodarone,[14] and could not tolerate Coreg[15] due to hypotension.  AR910.

_____

[13] Takotsubo cardiomyopathy is a weakening of the left ventricle, the heart's main pumping chamber, usually as the result of severe emotional or physical stress.  See https://www.health.harvard.edu/heart-healty/takotsubo-cardiomyopathy-broken-heart-syndrome (last accessed April 20, 2018).

[14] Amiodarone is used to treat heart rate problems that are life-threatening. It's usually given when other drugs haven't worked.

20

Ms. Marso presented to the hospital again on August 13, 2013, and was

admitted with chest heaviness and dyspnea, mid-sternal chest discomfort

reproducible on exam, with pain through her back.  AR910, 914, 918.  Another

echo performed on August 14, 2013, again revealed normal findings and 60-

65% ejection fraction.  AR920-22, 1435.  Ms. Marso's cardiology diagnoses on

discharge included takotsubo cardiomyopathy, chest pain, dyspnea, stroke,

cardiomyopathy, nonischemic, nonsustained ventricular tachycardia, and

ventricular dysfunction, along with her other diagnoses of lupus, depression,

Sjogrens, ankylosing spondylitis, and others.  AR923.  Ms. Marso's chest pain

was felt to be likely noncardiac, she was prescribed amio, aldactone for her

takotsubo cardiomyopathy, and amiodarone for her NSVT, and was discharged

on August 17, 2013.  AR923-24.

---

Amiodarone treats and prevents abnormal heartbeats by working inside cells to control muscle contractions in the heart. This helps your heart beat normally.
https://www.healthline.com/health/amiodarone-oral-tablet#about (last accessed April 20, 2018).

[15] Coreg (Carvedilol) is used to treat high blood pressure and heart failure. It is also used after a heart attack to improve the chance of survival if your heart is not pumping well. Lowering high blood pressure helps prevent strokes, heart attacks, and kidney problems.

This drug works by blocking the action of certain natural substances in your body, such as epinephrine, on the heart and blood vessels. This effect lowers your heart rate, blood pressure, and strain on your heart. Carvedilol belongs to a class of drugs known as alpha and beta blockers.
https://www.webmd.com/drugs/2/drug-5574/carvedilol-oral/details (last accessed April 20, 2018).

Ms. Marso presented for cardiac follow-up on September 10, 2013, and denied palpations, but did report some episodes of orthostatic dizziness/lightheadedness.  AR1412-13.  She was found to be asymptomatic with her most recent echocardiogram on August 14, 2013, showing normalized LV function with an ejection fraction of 60-65%.  AR1412.  Ms. Marso was seen again on October 8, 2013, and reported feeling a fast heartbeat, feeling lightheaded and squeezing in her chest once in a while, and was found to be asymptomatic, and continued on coumadin therapy.  AR1405, 1419.

Ms. Marso was seen again on April 21, 2014, for cardiac follow-up and a holter monitor had indicated no further episodes of ventricular tachycardia so she was to be weaned off of amiodarone.  AR1399.  An echocardiogram obtained on April 11, 2014, revealed an ejection fraction of 50-55% with mild mitral and tricuspid valve insufficiency.  AR1399, 1438.  Ms. Marso's cholesterol was elevated but she had no further episodes of chest pain or shortness of breath.  AR1399.

Ms. Marso was seen again for cardio follow-up on November 14, 2014, and the treatment note indicated that Ms. Marso had a "history of Tikosyn to cardiomyopathy normalization of the left ventricular function normal coronary anatomy nonsustained ventricular tachycardia which resolved.  She did normalization of LV function."  AR1394.  Ms. Marso's thyroid had been out of control with a TSH of 132 with medications adjusted by her primary care physician and she had occasional episodes of atypical electric sharp chest discomfort with a stinging quality that lasted less than a minute.  AR1394.

The note indicated no further workup was needed, but never mentioned an echocardiogram obtained on November 7, 2014, which revealed moderately reduced left ventricular ejection fraction of 35-45%, reversal of early to late diastolic velocities c/w diastolic dysfunction, mild mitral regurgitation, mild tricuspid regurgitation, and mild pulmonic valvular regurgitation.  AR 1440-41. It appears that echocardiogram was not available because the November 14, 2014, treatment note stated there were "no lab studies or procedures available for review at the time of the visit."  AR1398.

The appeal record also included a lower extremity arterial duplex test obtained on December 19, 2014, and a CT angiography of Ms. Marso's abdomen, pelvis, and lower arteries obtained on December 29, 2014, for an associated diagnosis of peripheral vascular disease; however, there are no other related treatment records in the appeal record.  AR1086-87, 1443-51.  The arterial duplex test indicated Ms. Marso was having symptoms of claudication (cramping, pain and weakness), and numbness and tingling in her legs. AR1450.  The duplex study of her lower extremities revealed calcified walls bilaterally, poor circulation in the right PTA, evidence of left iliac/CF stenosis, and moderate vascular insufficiency in the left lower extremity based on Doppler and pulse volumes and the CT was recommended.  AR1451.

### 4.    State Agency Physical RFC Assessments

The State agency assessment of Ms. Marso's physical limitations at the initial level was conducted under the Single-Decision Maker Model without the use or review of a medical expert.  AR119 (noting SDM NO-DR); see POMS DI

12015.100 at https://secure.ssa.gov/poms.nsf/lnx/0412015100.  The agency decision maker on August 10, 2012, found that Ms. Marso had severe DDD (disorders of back-discogenic and degenerative) and severe other and unspecified arthropathies.  AR115.  The decision maker found based on a record review that Ms. Marso could occasionally lift 20 pounds and frequently 10, stand and/or walk 6 hours of an 8-hour workday, sit 6 hours of an 8-hour workday.  The decision maker noted Ms. Marso's history of a MVA, osteoarthritis, anemia, lupus, thyroid problems, cholesterol, left knee injury, Sjogren's, vulvodynia, sleep problems, chronic neck and back pain, and a torn ligament in her right arm in the section provided for explanation of the exertional limits.  AR116.  The decision maker also found that Ms. Marso was limited to never climbing ladders/ropes/scaffolds, frequently climbing stairs/ramps, and occasionally balancing, stooping, kneeling, crouching, and crawling due to chronic pain, DDD, fatigue and tendinosis.  AR116-17.  The decision maker also found Ms. Marso was limited to only occasional overhead reaching on the right due to pain and must avoid concentrated exposure to vibration and hazards.  AR117-18.

The ALJ apparently recognized that the single-decision maker was not an acceptable medical source and expressly stated in the RFC finding that the RFC determination was based on the opinion of Christina Rodriguez, MD who completed the assessment at the reconsideration level.  AR17, 159.  However, the assessment completed by Dr. Rodriguez at the reconsideration level on

September 7, 2012, made virtually identical findings for severe impairments
and resulting limitations as the decision maker at the initial level, except
Dr. Rodriguez added environmental restrictions to also avoid extreme cold and
wetness.  AR155-58.

### 5.    State Agency Mental Assessments

As noted above, the State agency utilized a single decision maker rather
than an acceptable medical source at the initial level on August 12, 2012, and
noted that Ms. Marso complained of anxiety and alleged mental limitations, but
then stated that "this is inconsistent with MER objective findings and TS report
that NO MENTAL Impairment is present.  Mental has been addressed and ruled
out, no need for a PRTF."  AR114.  No mental assessment was conducted and
no acceptable medical source reviewed the evidence or signed the report.
AR110-120.

At the reconsideration on September 7, 2012, again Ms. Marso's
allegations of mental impairments and limitations were noted but the mental
health evidence was never reviewed by the State agency utilizing an acceptable
medical source and no mental assessment was completed.  AR154, 161.

### D.    Summary of Testimony at ALJ Hearing

### 1.    Ms. Marso's Testimony

Ms. Marso appeared at the video hearing on January 23, 2015.  AR31.
Ms. Marso testified that she did not have a teaching certificate but she worked
for the McCook school district for about two years in the computer lab two
hours per day Monday through Friday and as a physical education teacher one

hour per day, three days per week.  AR35, 38-40.  She explained her teaching duties were only part-time, and the rest of the time she assisted other teachers like watching over study halls or assisting in the library.  AR40.  She testified she also worked as a computer technical specialist and as a PC support person at Newsbank.  AR37.  Ms. Marso testified she left the job due to difficulty sitting with lower back pain.  AR41.  She testified that she had to lift 40-45 pounds at that job emptying water condensers.  AR43, see also AR276.

Ms. Marso testified she lived with a friend who carried the laundry for her, and she did some light dusting and loading or unloading the dishwasher.  AR45.  She said she used a computer to communicate with her daughter and to look up prices such as airline tickets.  AR46.  Ms. Marso testified that she had flown to South Dakota from Florida to visit her daughter but had back injections four days before she left that helped with being able to tolerate the flight and she utilized wheelchair assistance in the airport, but it was excruciating and it took a good day to settle back down.  AR54-55.

Ms. Marso said a typical day for her involved rest due to her fatigue.  AR48.  She would either rest or lay down with heat and ice 1-1½ hours twice per day.  AR48.  Ms. Marso testified she could sit for 30 minutes and stand or walk for 10-15 minutes and lift 10 pounds.  AR42.  Ms. Marso testified she used a cane that had been originally prescribed after a fall in 2009, and she used it at the time of the hearing when she felt unbalanced, which was becoming more frequent.  AR51-52.  Ms. Marso testified she had difficulty

26

concentrating and remembering things and had to reread things over again. AR53.

Ms. Marso testified that she had blurred vision, constipation, diarrhea, cramps, dizziness and tiredness due to her medications, including weekly Enbrel injections. AR48-49. Ms. Marso said her roommate gave her the injections because her right hand shakes and gets inflamed. AR49-50. She said she did not have the hand shake before her stroke in July 2013. AR50. Ms. Marso testified that after the stroke she was back in the hospital in August 2013, with chest pains and tachycardia, and she continued to have chest pains about once a week. AR55. She also testified that since the stroke people have told her she speaks with some hesitancy. AR56.

Ms. Marso testified that she received counseling at Hope Hospice related to her mother's passing and they also work on other issues that arise. AR58.

### 2.    Vocational Testimony

The ALJ's first hypothetical was to assume an individual who was limited as follows: "able to lift and carry 20 pounds, occasionally, and 10 pounds, frequently, stand or walk about six hours of an eight-hour workday, sit about six hours of an eight-hour workday." AR60. The ALJ then added that the individual required a cane for ambulation and the vocational specialist (VE) said the only past job available would be the user support analyst job. AR60.

The ALJ's second hypothetical was to assume an individual who was limited as follows: "able to lift and carry ten pounds, occasionally, and less than 10 pounds, frequently, stand or walk two hours of an eight-hour workday,

and sit at least six hours of an eight-hour workday." AR61. The ALJ then added that the individual required a cane for ambulation and the vocational specialist (VE) said the user support analyst job could be performed. AR61. The ALJ then added to this last hypothetical that the individual was able to sit for no longer than one hour at a time and stand or walk for no more than 15 minutes at one time before needing to change positions, but could continue working, and the VE testified that the user support analyst job would still be available. AR61.

The VE testified that if the individual in any of the hypotheticals required two breaks of 60-90 minutes to lay down each day there would be no work they could perform. AR62. The VE also testified that if an individual could not use their dominant hand to handle, finger and feel a majority of the day they would not be able to perform the user support analyst job. AR62.

The VE testified that her responses were consistent with the Dictionary of Occupational Titles except the sit and stand, the use of a cane, and the issues of breaks, which were all based on her vocational rehab experience, not the DOT. AR64.

## DISCUSSION

### A.    Standard of Review

When reviewing a denial of benefits, the court will uphold the Commissioner's final decision if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); Minor v. Astrue, 574 F.3d 625, 627 (8th Cir. 2009). Substantial evidence is defined as more than a mere scintilla, less

than a preponderance, and that which a reasonable mind might accept as adequate to support the Commissioner's conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971); Klug v. Weinberger, 514 F.2d 423, 425 (8th Cir. 1975). "This review is more than a search of the record for evidence supporting the [Commissioner's] findings, and requires a scrutinizing analysis, not merely a rubber stamp of the [Commissioner's] action." Scott ex rel. Scott v. Astrue, 529 F.3d 818, 821 (8th Cir. 2008) (internal punctuation altered, citations omitted).

In assessing the substantiality of the evidence, the evidence that detracts from the Commissioner's decision must be considered, along with the evidence supporting it. Minor, 574 F.3d at 627. The Commissioner's decision may not be reversed merely because substantial evidence would have supported an opposite decision. Woolf v. Shalala 3 F.3d 1210, 1213 (8th Cir. 1993); Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005). If it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Commissioner must be affirmed. Oberst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993). "In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record." Mittlestedt v. Apfel, 204 F.3d 847, 851 (8th Cir. 2000)(citations omitted).

The court must also review the decision by the ALJ to determine if an error of law has been committed. Smith v. Sullivan, 982 F.2d 308, 311 (8th Cir. 1992); 42 U.S.C. § 405(g). Specifically, a court must evaluate whether

the ALJ applied an erroneous legal standard in the disability analysis.

Erroneous interpretations of law will be reversed.  <u>Walker v. Apfel</u>, 141 F.3d

852, 853 (8th Cir. 1998)(citations omitted).   The Commissioner's conclusions

of law are only persuasive, not binding, on the reviewing court.  <u>Smith</u>, 982

F.2d at 311.

**B.     The Disability Determination and the Five-Step Procedure**

Social Security law defines disability as the inability to do any

substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has

lasted or can be expected to last for a continuous period of not less than twelve

months.  42 U.S.C. §§ 416(I), 423(d)(1); 20 C.F.R. § 404.1505.  The impairment

must be severe, making the claimant unable to do his previous work, or any

other substantial gainful activity which exists in the national economy.

42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

The ALJ applies a five-step procedure to decide whether an applicant is

disabled.  This sequential  analysis is mandatory for all SSI and SSD/DIB

applications.  <u>Smith v. Shalala</u>, 987 F.2d 1371, 1373 (8th Cir. 1993); 20 C.F.R.

§ 404.1520.  When a determination that an applicant is or is not disabled can

be made at any step, evaluation under a subsequent step is unnecessary.

<u>Bartlett v. Heckler</u>, 777 F.2d 1318, 1319 (8th Cir. 1985).  The five steps are as

follows:

**Step One:**    Determine whether the applicant is presently engaged
in substantial gainful activity. 20 C.F.R. § 404.1520(b). If the

applicant is engaged in substantial gainful activity, he is not disabled and the inquiry ends at this step.

**Step Two:** Determine whether the applicant has an impairment or combination of impairments that are *severe*, i.e. whether any of the applicant's impairments or combination of impairments significantly limit his physical or mental ability to do basic work activities.  20 C.F.R. § 404.1520(c).  If there is no such impairment or combination of impairments  the applicant is not disabled and the inquiry ends at this step. NOTE: the regulations prescribe a special procedure for analyzing mental impairments to determine whether they are severe.  Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992); 20 C.F.R. § 1520a.  This special procedure includes completion of a Psychiatric Review Technique Form (PRTF).

**Step Three:** Determine whether any of the severe impairments identified in Step Two meets or equals a "Listing" in Appendix 1, Subpart P, Part 404.  20 C.F.R. § 404.1520(d).  If an impairment meets or equals a Listing, the applicant will be considered disabled without further inquiry.  Bartlett 777 F.2d at 1320, n.2.  This is because the regulations recognize the "Listed" impairments are so severe that they prevent a person from pursuing any gainful work.  Heckler v. Campbell, 461 U.S. 458, 460, (1983).  If the applicant's impairment(s) are *severe* but do not meet or equal a *Listed impairment* the ALJ must proceed to step four.  NOTE: The "special procedure" for mental impairments also applies to determine whether a severe mental impairment meets or equals a Listing. 20 C.F.R. § 1520a(c)(2).

**Step Four:** Determine whether the applicant is capable of performing past relevant work (PRW).  To make this determination, the ALJ considers the limiting effects of all the applicant's impairments, (even those that are not *severe)* to determine the applicant's residual functional capacity (RFC).  If  the applicant's RFC allows him to meet the physical and mental demands of his past work, he is not disabled.  20 C.F.R. §§ 404.1520(e); 404.1545(e).  If the applicant's RFC does not allow him to meet the physical and mental demands of his past work, the ALJ must proceed to Step Five.

**Step Five:** Determine whether any substantial gainful activity exists in the national economy which the applicant can perform. To make this determination, the ALJ considers the applicant's

RFC, along with his age, education, and past work experience.
20 C.F.R. § 1520(f).

## C.    Burden of Proof

The plaintiff bears the burden of proof at steps one through four of the

five-step inquiry.  Barrett v. Shalala, 38 F.3d 1019, 1024 (8th Cir. 1994);

Mittlestedt, 204 F.3d at 852; 20 C.F.R. § 404.1512(a). The burden of proof

shifts to the Commissioner at step five.  "This shifting of the burden of proof to

the Commissioner is neither statutory nor regulatory, but instead, originates

from judicial practices." Brown v. Apfel, 192 F.3d 492, 498 (5th Cir. 1999).

The burden shifting is "a long standing judicial gloss on the Social Security

Act." Walker v. Bowen, 834 F.2d 635, 640 (7th Cir. 1987).  Moreover, "[t]he

burden of persuasion to prove disability and to demonstrate RFC remains on

the claimant, even when the burden of production shifts to the Commissioner

at step five." Stormo v. Barnhart 377 F.3d 801, 806 (8th Cir. 2004).

## D.    The Parties' Positions

Ms. McCaskill asserts the Commissioner erred by finding Ms. Marso not

disabled within the meaning of the Social Security Act.  She asserts the

Commissioner erred in three ways: (1) the Commissioner failed to properly

identify all of Ms. Marso's severe impairments; (2) the Commissioner's

determination of Ms. Marso's residual functional capacity (RFC) was not

supported by substantial evidence; and (3) the Commissioner erred in

assessing Ms. Marso's credibility.  The Commissioner asserts substantial

evidence supports the ALJ's determination that Ms. Marso was not disabled during the relevant time frame and the decision should be affirmed.

**E.    Analysis**

Ms. McCaskill's arguments are addressed in turn below:

**1.    Whether the Commissioner Failed to Properly Identify All of Ms. Marso's Severe Impairments?**

At step two of the analysis, the ALJ determined Ms. Marso had the following severe impairments: Takotsubo cardiomyopathy, lupus Sjogren syndrome, and hypothyroidism. AR16. The ALJ specifically mentioned Ms. Marso's depression, but after a fairly lengthy discussion, determined it was a medically determinable impairment, but that it was not severe. Id. at 16-17.

Ms. McCaskill's first assignment of error is that the ALJ failed to identify all of Ms. Marso's severe impairments at step two, and as a result failed to include all the necessary limitations into Ms. Marso's RFC. Specifically, Ms. McCaskill asserts that at the step two portion of the analysis, the ALJ never even mentioned, let alone identified as medically determinable and severe or not severe impairments Ms. Marso's: (1) degenerative disc disease of the cervical and lumbar spine; (2) ankylosing spondylitis; or (3) stroke. Ms. McCaskill argues there is simply no indication of whether the ALJ considered these impairments at step 2, whether the ALJ concluded they were medically determinable, and if so, whether they were severe or not severe and why.

In her memorandum, the Commissioner responds that substantial evidence supports the ALJ's findings at step two. The Commissioner asserts

the ALJ "clearly considered all [Ms.] Marso's alleged impairments, including her
alleged back problems and post-stroke symptoms, throughout her decision"
including in formulating Ms. Marso's RFC. As such, the Commissioner asserts
that any failure by the ALJ to specifically identify any of the impairments
claimed by Ms. McCaskill at step two and classify them as severe is harmless.

The Commissioner argues the real issue in this case is whether
substantial evidence supports the ALJ's formulation of Ms. Marso's RFC. See
Commissioner's brief, Docket 15, p. 6. After a claimant clears the step two
preliminary hurdle, the Commissioner argues, the classification of an
impairment as severe or non-severe carries no legal significance. Id.

"It is the claimant's burden to establish that his impairment or
combination of impairments are severe." Kirby v. Astrue, 500 F.3d 705, 707
(8th Cir. 2007). A severe impairment is defined as one which significantly
limits a physical or mental ability to do basic work activities. 20 C.F.R. § 1521.
An impairment is not severe, however, if it "amounts to only a slight
abnormality that would not significantly limit the claimant's physical or mental
ability to do basic work activities." Kirby, 500 F.3d at 707. "If the impairment
would have no more than a minimal effect on the claimant's ability to work,
then it does not satisfy the requirement of step two." Id. (citation omitted).
The claimant bears the burden of showing a severe impairment significantly
limits a physical or mental ability to do basic work activities, "but the burden of
a claimant at this stage is not great." Caviness v. Massanari, 250 F.3d 603,

34

605 (8th Cir. 2001).  Additionally, the impairment must have lasted at least twelve months or be expected to result in death.  See 20 C.F.R. § 404.1509.

In brief, the Commissioner cites three out-of-circuit cases for the proposition that the failure to identify a severe impairment at step two is harmless so long as benefits are not denied at step two:  Carpenter v. Astrue, 537 F.3d 1264, 1266 (10th Cir. 2008); Lewis v. Astrue, 498 F.3d 909, 911 (9th Cir. 2007); Maziarz v. Secretary of Health & Human Svcs. 837 F.2d 240, 244 (6th Cir. 1987).

In Carpenter, the court reversed and remanded because the ALJ failed to adequately consider all of the claimant's impairments in combination when determining whether she was disabled at the remaining steps of the disability process.  Carpenter, 537 F.3d at 1266-67.  And in Lewis, the court specifically stated that any error at step two of the analysis was harmless because the restrictions imposed by the claimant's bursitis (the impairment he alleged was erroneously omitted at step two) was discussed "extensively" at step four. Lewis, 498 F.3d at 911.

Similarly, in Maziarz, the court indicated that so long as the ALJ considered at least one impairment severe and continued with the remaining steps, failure to consider a different impairment severe was not reversible error. Maziarz, 837 F.2d at 244.  In Maziarz,  the ALJ noted the claimant's cervical condition and, though rejecting the severity of the claimant's alleged symptoms, took it into consideration in formulating the claimant's RFC and

determining he was not capable of his past relevant work. <u>Maziarz</u>, 837 F.2d at 242.

Ms. McCaskill cites <u>Nicola v. Astrue</u>, 480 F.3d 885, 886-87 (8th Cir. 2007), for the proposition that the failure to identify a severe impairment at step two is not harmless error but is instead grounds for reversal. In <u>Nicola</u>, the severe impairment the claimant alleged the ALJ failed to identify was borderline intellectual functioning. <u>Nicola</u>, 480 F.3d at 887. The Eighth Circuit noted when such a diagnosis is supported by sufficient medical evidence, it should be considered severe. <u>Id.</u> The court held the ALJ's failure to identify the impairment as severe was not harmless error. <u>Id.</u> The court reversed and remanded the case to the commissioner for further proceedings. <u>Id</u>.

As noted in <u>Lund v. Colvin</u>, 2014 WL 1153508 (D. Minn. Mar. 21, 2014), the district courts within the Eighth Circuit are not in agreement about the holding of <u>Nicola.</u> Some courts have interpreted it to mean that an ALJ's erroneous step-two failure to include an impairment as severe warrants reversal and remand, even when the ALJ found other impairments to be severe and therefore continued sequential analysis. Other courts have declined to interpret <u>Nicola</u> as establishing a *per se* rule that any error at step two is reversible error, so long as the ALJ continues with the sequential analysis. <u>See</u> <u>Lund</u> 2014 WL 1153508 at *26 (gathering cases). The central theme in the cases which hold reversal is not required is that "an error at step two may be

harmless where the ALJ considers all of the claimant's impairments in the evaluation of the claimant's RFC." Lund, 2014 WL 1153508 at *26.

More recently, this district court has interpreted Nicola to require reversal for failure to properly identify a severe impairment at step two, when that impairment is diagnosed and properly supported by sufficient medical evidence. See Quinn v. Berryhill, Civ. No. 4:17-04013-KES, Docket No. 21 at pp. 11-14 (D.S.D. Mar. 20, 2018) (error at step two not harmless where ALJ failed to identify medically determinable impairments). In Quinn the court acknowledged the district court split within the Eighth Circuit as described in Lund, but decided that in Ms. Quinn's case, the error was not harmless. Id. at p. 14.

> Here, the ALJ did not mention Quinn's obesity, and he did not make a finding as to whether Quinn's scoliosis or neck impairment—which he noted Quinn testified about—were medically determinable impairments that were either severe or not severe. There is evidence in the record to support such diagnoses, so they should have been addressed in the step two analysis. Because medically determinable impairments are so important to the RFC analysis at step four, the court finds that the ALJ's insufficient findings regarding Quinn's medically determinable severe impairments  at step two require remand for further development.

Id. at p. 14.

In Quinn, the court noted the claimant's burden to demonstrate a severe medically determinable impairment at step two, but emphasized the burden is not difficult to meet and any doubt about whether the claimant has met her burden is resolved in favor of the claimant.  Quinn, at *12-13 (citing Kirby, 500

F.3d at 707; Caviness, 250 F.3d at 605; and Dewald v. Astrue, 590 F. Supp. 2d 1184, 1199 (D.S.D. 2008) (citing SSR 85-28)).

An impairment is not severe if it does not significantly limit the claimant's physical or mental ability to do basic work activities.  See 20 C.F.R. § 404.1522(a).  Basic work activities include, but are not limited to:  walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, handling, seeing, hearing, speaking, use of judgment; responding appropriately to supervisors and co-workers and usual work situations, dealing with changes in a routine work setting, and understanding, carrying out, and remembering simple instructions.  Id. at (b).

Similar to the Quinn case, Ms. McCaskill argues that the ALJ's failure to consider Ms. Marso's degenerative disc disease, ankylosing spondylitis, and stroke as severe impairments is not harmless error, because the ALJ's analysis was completely silent as to whether she considered those conditions medically determinable impairments at all and if so whether they were severe or not severe, and finally what effect, if any, those conditions had upon Ms. Marso's RFC at step four.  The court therefore endeavors to determine whether the ALJ erred by failing to categorize Ms. Marso's degenerative disc disease, ankylosing spondylitis, and stroke as severe impairments and if so, whether that error in this instance constitutes reversible error under Nicola as interpreted through the lens of Lund  and Quinn.

The "failure to consider a known impairment in conducting a step-four inquiry is, by itself, grounds for reversal."  Spicer v. Barnhart, 64 Fed. Appx.

173, 178 (10th Cir. 2003).  See also Washington v. Shalala, 37 F.3d 1437,

1439-40 (10th Cir. 1994) ("failure to apply the correct legal standard . . . is

grounds for reversal.  We note that the ALJ failed to consider the Plaintiff's

[impairment] in conducting the step-four inquiry.  This failure, alone, would be

grounds for reversal.").   See also Pratt v. Sullivan, 956 F.2d 830, 834-35 (8th

Cir. 1992) (same).

Here, the court must agree with Ms. McCaskill that the ALJ utterly failed

to explain whether she considered Ms. Marso's degenerative disc disease,

ankylosing spondylitis, and stroke as medically determinable impairments—let

alone explain whether she considered them to be severe or not severe.  This

failure constitutes reversible error, because each of these medical conditions

was diagnosed and properly supported by sufficient medical evidence in the

record.

Beginning with degenerative disc disease, that condition is clearly

diagnosed and well-documented in the medical records.  Specifically, the state

agency physician upon whose opinion the ALJ relied (Dr. Christina Rodriguez)

found that degenerative disc disease—or DDD—was one of Ms. Marso's (indeed

was the primary) severe impairment(s).  AR155.  Ms. Marso's cervical disc

disease was documented by an MRI (AR383), which revealed problems that

ultimately led Ms. Marso to undergo a discectomy and fusion surgery in 2009.

AR381, 385.  X-rays in June, 2012, revealed spurring below the previous

fusion surgery site.  Another MRI was recommended but at that time,

Ms. Marso could not afford it.  AR608-09, 735.

Similarly, Ms. Marso underwent a lumbar MRI in 2009 which revealed a lesion at L5 and spondylolysis and bulging at L5. AR368. She received treatment for back pain, (including multiple epidurals) in her cervical and low back. AR616, 1294, 1299, 1300-1303, 1305-1309, 1326-1332, 1342-1347, 1371, 1374, 1380-81, 1383-84, 1386-87. A repeat lumbar MRI in October, 2013, showed no significant change from the 2009 study. AR1367-68.

Ms. Marso's ankylosing spondylitis was diagnosed in 2008 by her treating rheumatologist, Dr. Bustillo. AR599. Ms. Marso treated regularly with Dr. Bustillo, and his medical records were contained in the administrative record. Dr. Bustillo treated Ms. Marso by prescribing flexeril, trazodone, hydrocodone, and by prescribing weekly injections of Enbrel. AR691, 785, 796, 806-810. The symptoms Ms. Marso explained to Dr. Bustillo included ongoing pain and fatigue. Id. Ms. Marso stopped her Enbrel for a time, because she reported it caused a rash. AR745. This caused her symptoms to increase. AR744. In fact, even when she was taking Enbrel, Ms. Marso reported to Dr. Bustillo that she had trouble with her activities of daily living. AR691-92 (reported significant problems with ADLs of laundry, cooking, shopping); AR702 (off Enbrel, reported difficulty walking and getting dressed); AR724-25 (off Enbrel, reported difficulty walking and getting dressed); AR734 (off Enbrel, reported difficulty walking, getting dressed, bathing, housework, laundry, and shopping); AR754 (on no medications, reported difficulty with walking and getting dressed); AR785 (on Enbrel, reported mild back pain, fatigue, difficulty

40

walking); AR805-06 (on Enbrel, reported minimal stiffness, but continued fatigue and difficulties with any activities of daily living).

When discussing Ms. Marso's medically determinable impairments at step two, the ALJ seemed to dismiss her subjective pain complaints regarding her cervical and lumbar pain because she had received epidural steroid injections in 2012, which she reported to be effective. AR19. But the ALJ did not mention ankylosing spondylitis or Dr. Bustillo's long-standing treatment of Ms. Marso. Nor did the ALJ mention this condition or Dr. Bustillo in the section of the written decision regarding the formulation of the RFC at step four. Despite the significant symptoms and the limiting effects of those symptoms upon her activities of daily living as reported by Ms. Marso to Dr. Bustillo and the years of treatment she received for this condition, neither ankylosing spondylitis nor Dr. Bustillo are mentioned anywhere in the ALJ's opinion.

Finally, Ms. Marso's stroke is also well-documented in the medical and administrative record. AR910, 920, 924. She was required to begin taking Coumadin as a result of this diagnosis. AR910. Even so, she continued to report chest pain and heaviness. AR910-11. Ms. Marso's stroke was listed as one of the causes of her death. Docket 11-1.

The ALJ likewise did not discuss degenerative disc disease, ankylosing spondylitis, or stroke when determining whether Ms. Marso had an impairment or combination of impairments which met or medically equaled a listing at step three. AR17. This further supports the conclusion that the ALJ simply did not

41

decide in the first instance whether any of these conditions were medically determinable impairments.

In brief, the Commissioner correctly notes that in her discussion regarding the formulation of Ms. Marso's RFC, the ALJ did at least note Ms. Marso's subjective complaints regarding her stroke and her cervical and lumbar pain.  AR18-19.  But in the absence of a clear explanation by the ALJ at step two regarding whether she considered these conditions medically determinable impairments, it is impossible for this court to review the significance of these comments—especially in light of the ALJ's final sentence which reiterates that she finds Ms. Marso's *medically determinable impairments* could cause her symptoms, but her statements regarding the intensity, persistence and limiting effects of her symptoms are only partially credible. AR19.  For these reasons, this court finds that the ALJ should have explicitly determined at step two whether Ms. Marso's degenerative disc disease, ankylosing spondylosis, and stroke were medically determinable impairments and if so whether they were severe.  Failure to do so constituted reversible error.

### 2.    Whether The Commissioner's Formulation of Ms. Marso's RFC is Supported by Substantial Evidence?

Ms. McCaskill's next assignment of error is that the ALJ's formulation of Ms. Marso's RFC at step four of the analysis is not supported by substantial evidence.  The basis for this claim is threefold.  First, Ms. McCaskill asserts the ALJ's claim that she relied upon the expert opinion of Dr. Rodriguez cannot be

reconciled with the ALJ's findings that are inconsistent with Dr. Rodriguez' opinions—both as to the medically determinable impairments suffered by Ms. Marso and as to Ms. Marso's physical limitations. The ALJ did not explain how she ascribed "great weight" to Dr. Rodriguez' opinion when the ALJ adopted completely different medically determinable impairments than did Dr. Rodriguez and assigned different physical limitations than did Dr. Rodriguez, without ever explaining the inconsistencies.

Next, Ms. McCaskill asserts that even if one disregards the discrepancy presented by the ALJ's adoption of an expert opinion that is at odds with the ALJ's ultimate determinations, the ALJ's own RFC formulation does not allow for substantial gainful employment. This, Ms. McCaskill asserts, is because according to the RFC as articulated by the ALJ, Ms. Marso was only capable of working a six-hour day. Specifically, the ALJ's written decision stated that Ms. Marso could "sit, stand, or walk for six hours in an eight hour workday. . ." and that she could sit for no more than one hour at a time, stand or walk no more than 15 minutes at one time before needing to change positions, but could continue working, and required a cane for ambulation. AR17. Under these limitations, argues Ms. McCaskill, Ms. Marso would have been precluded from full-time employment.

Finally, Ms. McCaskill asserts the RFC is not supported by substantial evidence because even though the ALJ found Ms. Marso had non-severe depression which caused mild restrictions in her activities of daily living, social functioning, and in maintaining concentration, persistence or pace, the ALJ did

not include *any* mental limitations in Ms. Marso's RFC nor did the ALJ explain why none were included.

Residual functional capacity is "defined as what the claimant can still do despite his or her physical or mental limitations." <u>Lauer v. Apfel</u>, 245 F.3d 700, 703 (8th Cir. 2001) (citations omitted, punctuation altered).  "The RFC assessment is an indication of what the claimant can do on a 'regular and continuing basis' given the claimant's disability.  20 C.F.R. § 404.1545(b)." <u>Cooks v. Colvin</u>, 2013 WL 5728547 at *6 (D.S.D. Oct. 22, 2013).  The formulation of the RFC has been described as "probably the most important issue" in a Social Security case.  <u>McCoy v. Schweiker</u>, 683 F.2d 1138, 1147 (8th Cir. 1982), <u>abrogation on other grounds recognized in</u> <u>Higgins v. Apfel</u>, 222 F.3d 504 (8th Cir. 2000).

When determining the RFC, the ALJ must consider all of a claimant's mental and physical impairments in combination, including those impairments that are severe and those that are nonsevere.  <u>Lauer</u>, 245 F.3d at 703; Social Security Ruling (SSR) 96-8p 1996 WL 374184 (July 2, 1996).  Although the ALJ "bears the primary responsibility for assessing a claimant's residual functional capacity based on *all* the relevant evidence . . . a claimant's residual functional capacity is a medical question."[16]  <u>Lauer</u>, 245 F.3d at 703 (citations

---

[16] Relevant evidence includes:  medical history; medical signs and laboratory findings; the effects of treatment, including limitations or restrictions imposed by the mechanics of treatment (e.g., frequency of treatment, duration, disruption to routine, side effects of medication); reports

omitted) (emphasis added).  Therefore, "[s]ome medical evidence must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace."  Id. (citations omitted).

"The RFC assessment must always consider and address medical source opinions."  SSR 96-8p.  If the ALJ's assessment of RFC conflicts with the opinion of a medical source, the ALJ "must explain why the [medical source] opinion was not adopted."  Id.  "Medical opinions from treating sources about the nature and severity of an individual's impairment(s) are entitled to special significance and may be entitled to controlling weight.  If a treating source's medical opinion on an issue of the nature and severity of an individual's impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record, the [ALJ] must give it controlling weight."  Id.

Ultimate issues such as RFC, "disabled," or "unable to work" are issues reserved to the ALJ.  Id. at n. 8.  Medical source opinions on these ultimate issues must still be considered by the ALJ in making these determinations.  Id. However, the ALJ is not required to give such opinions special significance because they were rendered by a treating medical source.  Id.

---

of daily activities; lay evidence; recorded observations; medical source statements; effects of symptoms, including pain, that are reasonably attributable to a medically determinable impairment; evidence from attempts to work; need for a structured living environment; and work evaluations.  See SSR 96-8p.

"Where there is no allegation of a physical or mental limitation or restriction of a specific functional capacity, and no information in the case record that there is such a limitation or restriction, the adjudicator must consider the individual to have no limitation or restriction with respect to that functional capacity." SSR 96-8p. However, the ALJ "must make every reasonable effort to ensure that the file contains sufficient evidence to assess RFC." Id.

When writing its opinion, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence. . . In assessing RFC, the adjudicator must . . . explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." Id.

Finally, "[T]o find that a claimant has the [RFC] to perform a certain type of work, the claimant must have the ability to perform the requisite acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." Reed, 399 F.3d at 923) (citations omitted, punctuation altered); SSR 96-8p 1996 WL 374184 ("RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis" for "8 hours a day, for 5 days a week, or an equivalent work schedule.").

The court begins with Ms. McCaskill's assertion that the ALJ's RFC determination was not supported by substantial evidence because the medical opinion upon which the ALJ relied did not resemble the ALJ's final

determination.  This is because neither the medical impairments nor the physical limitations formulated by the ALJ "matched" those which were articulated by the State Agency physician, Dr. Rodriguez.  Ms. McCaskill points out that the medically determinable impairments Dr. Rodriguez believed Ms. Marso had were degenerative disc disease and "other unspecified arthropathies." AR155.  But the ALJ, though giving Dr. Rodriguez' opinion "great weight,"  did not recognize either of these as medically determinable impairments.  AR16.  Instead, the ALJ recognized Takotsubo cardiomyopathy, lupus Sjogren syndrome, and hypothyroidism as severe impairments and depression as a non-severe impairment.  Id.  There is a complete disconnect between the ALJ's findings and Dr. Rodriguez' findings on this score.

As for Ms. Marso's resulting physical restrictions, Dr. Rodriguez found Ms. Marso should never climb ladders/ropes/scaffolds, that she could frequently climb stairs/ramps, and only occasionally balance, stoop, kneel, crouch and crawl.  AR156-57.  These restrictions were imposed specifically because of Ms. Marso's "chronic pain complaints, DDD, fatigue, and tendinosis." AR157.  Nevertheless, the RFC as formulated by the ALJ included none of these limitations. AR17.

Dr. Rodriguez also limited Ms. Marso to only occasional overhead reaching with the right upper extremity because of her pain complaints. AR157.  The ALJ, however, imposed no manipulative restrictions. AR17.

Dr. Rodriguez limited Ms. Marso to avoiding concentrated exposure to cold, wetness, vibration, and hazards because of her pain, degenerative disc

disease, tendonitis and lupus.  AR157-58.  The ALJ, however, imposed <u>no</u> environmental restrictions.  AR17.

Dr. Rodriguez' opinion did not include detailed instructions for alternating between sit, stand, and walk within the 8 hour workday, but the ALJ's formulation of Ms. Marso's physical restrictions was very specific that she could only sit for an hour at a time, stand or walk no more than 15 minutes at a time before changing positions, but could continue to work and required a cane for ambulation.  AR17.  Because these very specific restrictions do not appear in Dr. Rodriguez' state agency assessment, and she did not testify at the hearing, they do not originate from her.  The ALJ did not cite to any other medical evidence in the record to support them.

The Commissioner agrees that some medical evidence must support the ALJ's decision, but argues there is no requirement that an RFC finding be supported by a *specific* medical opinion, citing <u>Hensley v. Colvin</u>, 829 F.3d 926, 932 (8th Cir. 2016).  Instead, the Commissioner argues, the ALJ may rely on the medical records themselves to formulate the RFC.  <u>Id.</u>  In <u>Hensley</u>, the claimant received his medical care at the VA.  <u>Id.</u> at 929-30.  After he applied for Social Security benefits, Mr. Hensley asked one of his treating physicians at the VA to complete an assessment of his ability to perform work-related activities, as is typically found in the administrative record.  <u>Id.</u> at 932.  The physician (Dr. McKelvey), however, refused to do so because it was against the VA's policy.  <u>Id.</u>  Instead, Dr. McKelvey wrote a "to whom it may concern" letter, summarizing his VA disability exam of Mr. Hensley and addressing

48

Mr. Hensley's medical conditions. Id.  There was no other opinion evidence in the administrative record, but the ALJ based his RFC findings upon Dr. McKelvey's letter, along with Mr. Hensley's extensive VA medical records which were also in the administrative record. Id.  The Hensley court found that "in the absence of medical opinion evidence, 'medical records prepared by the most relevant treating physicians can provide affirmative medical evidence supporting the ALJ's residual functional capacity findings.' " Id. (citing Johnson v. Astrue, 628 F.3d 991, 995 (8th Cir. 2011).

Therefore, the Commissioner argues, just because the ALJ gave "great weight" to Dr. Rodriguez' opinion does not mean the ALJ was bound to accept each and every restriction articulated by Dr. Rodriguez, or that the ALJ was not free to articulate some physical restrictions of her own, so long as they were supported elsewhere in the medical evidence of record.

In her written decision, the ALJ acknowledged Ms. Marso's cervical and lumbar pain, but did not determine (as did Dr. Rodriguez) that degenerative disc disease amounted to a medically determinable impairment or that Ms. Marso's pain complaints regarding her cervical and lumbar spine were credible. AR19.  The explanation offered by the Commissioner for these conclusions was (1) that Ms. Marso had received epidural steroid injections which were effective in reducing her pain and; (2) the objective testing of the lumbar spine showed only broad base bulging at L3-4, L4-5, and L5-S1. Dr. Rodriguez, upon whose opinion the ALJ relied and gave great weight, however, had reviewed this very same medical information but had reached the

49

opposite conclusion.  Dr. Rodriguez <u>did</u> find Ms. Marso's degenerative disc disease to be a medically determinable impairment (a severe impairment at that) and  Dr. Rodriguez <u>did</u> assign physical restrictions as a result.  AR155-57.

<u>Hensely</u> explains that in the *absence* of medical opinion evidence, the ALJ may rely on other medical record evidence to formulate the RFC, and that the RFC need not be based upon a specific medical opinion.  <u>Hensely</u>, 829 F.3d at 932.  In Ms. Marso's case the administrative record <u>did</u> contain medical opinion evidence, which the ALJ purported to give great weight.   While it is true that the ALJ is free to formulate the RFC from all of the evidence including the opinion evidence and the medical records, it is also established law that the ALJ may not substitute his or her own opinions for those of the physician (<u>Finch v. Astrue</u>, 547 F.3d 933, 938 (8th Cir. 2008)), nor may the ALJ "play doctor" or rely on her own interpretation of the meaning of the medical records. <u>Pate-Fires v. Astrue</u>, 564 F.3d 935, 946-47 (8th  Cir. 2009).  These principles were recently reaffirmed in <u>Combs v. Berryhill</u>, 878 F.3d 642, 647 (8th Cir. 2017) and were neither overruled nor weakened by <u>Hensley</u>.

Additionally, SSR 96-8p instructs ALJs how to determine RFC and how to explain their determinations.  That ruling contains requirements for the ALJ's narrative discussion.  One of those requirements is that the RFC assessment must "include a resolution of any inconsistencies in the evidence as a whole . . ."  <u>Id.</u> at p. 13.  Another is that "[t]he RFC assessment must always consider and address medical source opinions.  If the RFC assessment

conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." Id. at p. 14.  In Ms. Marso's case, the ALJ neither resolved the conflict between Dr. Rodriguez' conclusions and the ALJ's conclusions, nor did the ALJ explain why, after purporting to give Dr. Rodriguez' opinions "great weight," she rejected the very conclusions upon which Dr. Rodriguez was asked to give her opinion, and which the ALJ claimed to adopt.

To the extent the ALJ discounts opinions from persons who have provided them, the ALJ must explain *what portions* of those opinions are rejected and *why*.  Therefore, this court is at a loss to see where the physical RFC arrived at by the ALJ is supported by any medical evidence.  The RFC must be supported by at least "some" medical evidence.  Lauer, 245 F.3d at 703.  For these reasons, the court agrees with Ms. McCaskill that the ALJ's formulation of Ms. Marso's physical RFC was not supported by substantial evidence.

Next, Ms. McCaskill argues that even under the RFC as articulated by the ALJ, Ms. Marso would not have been capable of SGA, because even the ALJ's formulation limited Ms. Marso to a six-hour workday.  Here, the court begins with the hypothetical the ALJ proposed to the vocational expert during the hearing.  AR60-62.  The court repeats the ALJ's recitation of the hypothetical from the FACTS section, above:

> The ALJ's first hypothetical was to assume an individual who was limited as follows:  "able to lift and carry 20 pounds, occasionally, and 10 pounds, frequently, stand or walk about six hours of an

eight-hour workday, sit about six hours of an eight-hour workday." AR60.  The ALJ then added that the individual required a cane for ambulation and the vocational specialist (VE) said the only past job available would be the user support analyst job. AR60.

The ALJ's second hypothetical was to assume an individual who was limited as follows:  "able to lift and carry ten pounds, occasionally, and less than 10 pounds, frequently, stand or walk two hours of an eight-hour workday, and sit at least six hours of an eight-hour workday." AR61.  The ALJ then added that the individual required a cane for ambulation and the vocational specialist (VE) said the user support analyst job could be performed.  AR61.  The ALJ then added to this last hypothetical that the individual was able to sit for no longer than one hour at a time and stand or walk for no more than 15 minutes at one time before needing to change positions, but could continue working, and the VE testified that the user support analyst job would still be available.  AR61.

It is clear from the both hypotheticals the ALJ proposed to the VE that the ALJ intended both the hypotheticals to reflect an ability to work a total of at least eight hours per day (the first hypothetical indicated six hours standing or walking and six hours of sitting; the second indicated standing or walking for two hours and sitting for six hours).  But when the ALJ wrote her opinion, she indicated Ms. Marso was capable of standing, walking or sitting for a total of six hours in an eight hour work day, period.  AR17.  Because that option was not one of the hypotheticals posed to the VE, the court must agree with the Commissioner that this use of the word *or* instead of *and* in the ALJ's written decision was a mere scrivener's error.  The court will not find error in the ALJ's decision on this basis.

Ms. McCaskill next argues that the RFC formulated by the ALJ is not supported by substantial evidence because though the ALJ found Ms. Marso

had a mild mental impairment (depression), the ALJ did not clearly articulate within the RFC any limitations which could be attributed to Ms. Marso's mild depression.  Here the court does not perceive any error.

The Commissioner correctly notes that Ms. Marso did not allege depression as one of the impairments which affected her ability to work.  See AR294 (disability report-adult, listing fourteen different conditions but not depression). This alone would not preclude the consideration of depression as a medically determinable impairment which limited Ms. Marso's ability to work, if there was record evidence supporting functional limitations as a result of such an impairment.

In fact, the ALJ found Ms. Marso's depression was a non-severe medical impairment.  However, the medical records are devoid of any evidence that Ms. Marso regularly sought or received mental health treatment for symptoms of depression, or what, if any effect her mild depression placed upon her ability to work.  Therefore, the Commissioner correctly notes that the record contains no evidence to support any mental functional limitations.  As such, there was no evidence upon which the ALJ could properly draw to reach such a conclusion.   Partee v. Astrue, 638 F.3d 860, 864 (8th Cir. 2011) (some of the factors an ALJ may consider when determining a claimant is not disabled by a mental impairment are whether the claimant alleged a mental impairment in his application, failure to seek treatment, claimant's own statements, and lack of medical evidence indicating mental impairment).  The court finds no error in

53

the ALJ's failure to attribute any functional limitations to Ms. Marso's mild depression.

### 3.    Whether the Commissioner Erred in Assessing Ms. Marso's Credibility?

Ms. McCaskill's final assignment of error is that the ALJ's credibility analysis failed to adequately explain which of her symptoms the ALJ found credible and which she did not find credible, and why. As such, Ms. McCaskill argues, the ALJ's credibility findings were really just conclusions in the guise of findings, were not properly supported as required by the SSA's own regulations, and were not supported by substantial evidence.

### a.    The Law Applicable to Credibility[17] Determinations

In determining whether to fully credit a claimant's subjective complaints of disabling pain, the Commissioner engages in a two-step process:  (1) first, is there an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the claimant's symptoms; and (2) if so, the Commissioner evaluates the claimant's description of the intensity

---

[17] The court notes that as of March 28, 2016, the Commissioner determined to discontinue the use of the term "credibility" in its sub-regulatory policy. See SSR 16-3p (which superseded SSR 96-7p). The Commissioner wanted to make clear that in evaluating a claimant's subjective complaints of symptoms, it was not evaluating the claimant's character. Id. The court uses the term "credibility" herein because it is prevalent in the case law that has developed, the ALJ used that term (AR19), and the ALJ issued her decision under the prior SSR 96-7p because the ALJ's decision ( March 6, 2015), was issued before SSR 96-7p was superseded by SSR 16-30 (Mar. 28, 2016). Nevertheless, like the Commissioner, this court emphasizes that "credibility" is not interchangeable with "character."

and persistence of those symptoms to determine the extent to which the symptoms limit the claimant's ability to work.  See SSR 16-3p; 20 C.F.R. § 404.1529.  Here, the ALJ found Ms. Marso had medically determinable physical[18] and mental impairments that could reasonably be expected to produce her symptoms in accordance with part 1 above.  So the credibility determination rested on the second prong discussed above.

In evaluating the second prong of the analysis, an ALJ must consider several factors.  The factors to consider include:  whether such complaints are supported by objective medical findings, whether the claimant has refused to follow a recommended course of treatment, whether the claimant has received minimal medical treatment, whether the claimant takes only occasional pain medications, the claimant's prior work record, observation of third parties and examining physicians relating to the claimant's daily activities; the duration, frequency, and intensity of the pain; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions.  Wagner v. Astrue, 499 F.3d 842, 851 (8th Cir. 2007) (citing Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)).  A claimant's

---

[18] As discussed previously, the ALJ did *not* herself find that Ms. Marso suffered from the same medically determinable physical impairments as did the State Agency physician upon whose opinion the ALJ relied--most notably degenerative disc disease.  But the ALJ did purportedly rely upon the opinions of physician who *did* conclude Ms. Marso suffered from degenerative disc disease.  The ALJ then incorporated some of that physician's opinions as to the effect of  degenerative disc disease into Ms. Marso's physical RFC.

subjective complaints of pain may be discredited only if they are inconsistent with the evidence as a whole.  Id.

With regard to the factor of a claimant's daily activities, the ALJ must consider the "quality of the daily activities and the ability to sustain activities, interest, and relate to others *over a period of time* and the frequency, appropriateness, and independence of the activities."  Wagner, 499 F.3d at 852 (citing Leckenby v. Astrue, 487 F.3d 626, 634 (8th Cir. 2007)) (emphasis in original).  Although activities which are inconsistent with a claimant's testimony of disabling pain reflect negatively on the claimant's credibility, the ability to do light housework and occasional visiting with friends does not support a finding that the claimant can do full-time work in the "competitive and stressful conditions in which real people work in the real world."  Reed, 399 F.3d at 923 (quoting Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989)).

An ALJ need not methodically discuss every Polaski factor so long as the factors are all acknowledged and considered in arriving at a conclusion.  Steed v. Astrue, 524 F.3d 872, 876 (8th Cir. 2008).  If adequately supported, credibility findings are for the ALJ to make.  Id. (citing Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cor. 2006)).  Generally, the ALJ is in a better position to evaluate credibility of witnesses and courts on judicial review will defer to the ALJ's credibility determinations so long as they are supported by substantial evidence and good reasons.  Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006).  See also Eichelberger v. Barnhart, 390 F.3d 584, 590 (8th Cir. 2004)

(stating "[w]e will not substitute our opinion for that of the ALJ, who is in a better position to assess credibility.").

The Eighth Circuit has said "in many disability cases, there is no doubt that the claimant is experiencing pain; the real issue is how severe that pain is." Woolf, 3 F.3d at 1213.  So too, here:  there is no question Ms. Marso experienced symptoms; the real issue is how severe those symptoms are.  The Polaski factors assist the ALJ in making that determination.

### b.    Summary of Ms. Marso's Statements

In her written function report (AR303), Ms. Marso explained that due to her physical limitations, she had difficulty sitting for long periods of time and difficulty concentrating.  She further explained that she suffered from severe bone and joint pain and that she could not lift/carry anything over ten pounds. Id.  She also described rashes and swelling, headaches, inability to sleep, and blurred vision.  Id.  She further claimed extreme fatigue and anxiety whenever she had to complete paperwork or documentation.  Id.  She found herself procrastinating about things that she never had before.  Id.   Regarding her daily activities, Ms. Marso explained it took an hour to be able to just get up and move.  AR304.  On days she was feeling well and physically able, she would walk the dog.  Id.  In the evening, she would shower and watch TV.  Id. She qualified this answer by explaining that her friend/roommate helped by feeding, bathing and medicating the dog and taking it to the vet.  Id.

As for activities that she could no longer do, Ms. Marso explained that she could no longer  work full-time, nor make the 30-minute drive to her former job without pain.  Id.  She also could no longer participate in going to the beach, doing pet therapy, officiating volleyball, or working as a photographer.  Id.  She no longer socialized.  Id.  She could not sleep because of pain and a "racing" mind.  Id.

Ms. Marso also indicated her ability to care for herself was affected by her impairments.  She had trouble dressing herself because it was difficult to lift and bend her arms.  Id.  She had trouble bathing herself and washing her hair because her balance was not good.  Id.  She had installed railings in the tub for this reason.  Id.  She had also installed an ADA compliant toilet to assist her ability to use the bathroom.  Id.  She set alarms to help her remember to take medications, and her friend/roommate gave her the injections she needed.  AR305.  Her roommate also prepared some meals for her.  Id.  She further explained that she did laundry, but with the help of her roommate.  Id.  She did light dusting, but her roommate did all outdoor and many indoor chores.  Id.   She needed help carrying heavy items.

Ms. Marso explained she was capable of driving and going out alone.  AR306.  She estimated she went out shopping every other week.  Id.  She was able to pay bills and handle money.  Id.  Ms. Marso listed her medications and their various side effects in her function report.  Id.

During the ALJ hearing in January, 2015, Ms. Marso testified that she left her last full-time job because her low back pain caused her to have

58

difficulty sitting. AR41.  She estimated she could sit for half an hour and stand

for ten or fifteen minutes.  AR42.  She estimated she could lift ten pounds.  Id.

She told the ALJ that Drs. Fenning and Fuchs had imposed physical

restrictions upon her.  She estimated she last saw Dr. Fenning (who was then

retired) in 2008 or 2009.  Id.  She had fallen in November, 2009, and sustained

an avulsion fracture of her ischial tuberosity, and Dr. Fenning restricted her

from lifting or carrying anything for a certain period of time.  AR43.  Eventually

he allowed her to lift and carry ten pounds.  AR43.  In January, 2009,

Ms. Marso underwent a vertebral fusion.  Id. It was at that time that Dr. Fuchs

restricted her from lifting any weight.  Id.  Eventually, Dr. Fuchs increased the

weight limit she could lift, but she could not recall the final limit imposed by

Dr. Fuchs.  Id.  She last saw Dr. Fuchs in the middle or end of 2009.  Id.

Ms. Marso flew to South Dakota from Florida in 2008 and 2012.  AR44.

She spent five days in South Dakota in 2012 when her mother died.  Id.  More

recently, she flew to South Dakota and spent six days when her granddaughter

was born.  Id.  Four days before that trip, Ms. Marso underwent injections in

her lower back so the trip would be tolerable.  AR 54.  Also, she requested a

wheelchair assist to get her to the jet and to her connecting flight.  AR55.

Ms. Marso explained she lived with a female friend in Florida, in the

friend's home.  AR44.  Her friend helped her do the laundry.  She infrequently

went to church (on holidays) and infrequently (two or three times a year)

planted flowers.  AR45-46.  She communicated with her daughter on the

computer.  AR46.  She used the computer to look up airline ticket prices, but

had only traveled those few times for her mother's funeral and to visit her granddaughter.  Id.  She described her typical day as resting because of her fatigue.  AR48.  She rested for an hour or an hour and a half at a time on a heating pad or ice, whichever helped her pain.  Id.  She described side effects of her medications (Zofran, Flexeril, and Pilocarpine) as blurred vision, constipation, diarrhea, stomach cramps, dizziness, and fatigue.  She also explained that she got cellulitis from her Enbrel.  She reiterated that she could not give herself  the Enbrel injections because her right hand shook too much, so her roommate (Maria) gave them to her.  AR49-50.  The right hand shake began sometime after her stroke occurred in July, 2013.  AR50.  She recalled being in the hospital immediately after the stroke and being unable to open things (like a bottle cap) with her right hand.  AR50.  She is right-handed and writes with  her right hand, but she is able to eat with her left hand.  AR51.  She has trouble writing because of her hand shaking. AR53.

Dr. Fenning prescribed her cane and she began using it in 2009.  AR52.  She only uses it when she feels unbalanced.  Id.  Since her stroke, Ms. Marso described herself as going from a "Type A" personality to being easily overwhelmed and emotional.  AR55-56. She also explained that she sometimes "lost" words.  AR56.  She tossed and turned most nights  because of her back pain and did not sleep well.  AR56.  She had tried a walking program and physical therapy, but both had failed.  AR57.  She explained "it hurt me more than it did me any good."  Id.

During the hearing, Ms. Marso explained that her primary care provider was Virginia Bihari, an ARNP.[19]  AR58.  Her treating rheumatologist was Dr. Bustillo, whom she saw every three to four months.  Id.  She saw Dr. Mahaney (a "spine doctor,") for regular for injections.  Id.  Finally, she saw Dr. Butler, a cardiologist, every three or four months.  Id.  She testified that she saw a therapist at Hope Hospice regarding her mother's death and "other issues that arise."  Id. [20]

### c.    Analysis of the ALJ's Credibility Evaluations

In the Wagner case, the ALJ's discrediting of the claimant's subjective complaints of pain was affirmed on appeal where Wagner had engaged in extensive daily activities, as evidenced by his "Daily Activities Questionnaire" and his testimony at the hearing, and where his testimony as to the limiting effect of his pain was inconsistent with the medical record because his records reflected that he did not pursue ongoing evaluation or treatment for his pain and he did not seek or take pain medication on a regular basis.  Wagner, 499 F.3d at 852-853.  See also Baker v. Barnhart, 457 F.3d 882, 892-894 (8th Cir. 2006) (affirming ALJ's discrediting of claimant's subjective complaints of pain where claimant engaged in a significant amount of activities of daily living--full

---

[19] Advanced Registered Nurse Practitioner.
https://www.nursinglicensure.org/np-state/florida-nurse-practitioner.html (last accessed April 20, 2018).

[20] The administrative record contains no medical or counseling records from Hope Hospice.

self-care, driving a car, shopping, and running errands--a medical source opined that the claimant engaged in symptom exaggeration, the claimant did not take pain medication, and the absence of an etiology for the alleged pain).

In Bentley v. Shalala, 52 F.3d 784 (8th Cir. 1995),  the ALJ's discrediting of the claimant's subjective complaints of pain was affirmed on appeal where the claimant had not sought medical treatment for his pain for a long period of time and was not taking any prescription medication for pain.  In addition, the record reflected that the claimant had applied for a number of jobs during his claimed disability period.  Id. at 785-86.

In Harvey v. Barnhart, 368 F.3d 1013 (8th Cir. 2004), an ALJ who discredited the claimant's testimony as to limitations on his activities was affirmed where the evidence showed the claimant had made prior inconsistent statements to his physicians regarding his limitations and his asserted need to use crutches or a non-prescribed walker was inconsistent with statements made by the claimant on other occasions.  Id. at 1015-1016.

In Guilliams v. Barnhart, 393 F.3d 798 (8th Cir. 2005), the Eighth Circuit affirmed an ALJ's discrediting of the claimant's subjective complaints of back pain where claimant used a cane, but no medical prescription for the cane existed; where several medical exams revealed the claimant to be in no significant distress; where MRIs of the spine revealed essentially normal findings; where the claimant's muscle mass was not atrophied despite his allegation of restriction of motion and diminishment of strength; where the claimant declined to follow medical advice regarding treatment of his pain; and

where medical evidence demonstrated that pain medication alleviated the claimant's symptoms of pain.  Id. at 802-03.

In Dolph v. Barnhart, 308 F.3d 876 (8th Cir. 2002), the ALJ's discrediting of the claimant's subjective complaints of pain from kidney disease and degenerative spine disease was affirmed where the claimant's records of her kidney disease showed "consistently stable renal function" and there was no record support for complaints of ongoing, severe, protracted discomfort.  Id. at 879-80.

An ALJ may consider whether an examining medical source determines that the claimant was malingering in assessing the credibility of the claimant's testimony as to subjective complaints of pain.  Clay v. Barnhart, 417 F.3d 922, 930 n.2 (8th Cir. 2005) (two psychologists' findings that claimant was malingering cast suspicion on the claimant's credibility).  "Especially in cases . . . where medical evidence is conflicting, a claimant's failure to seek treatment may buttress a particular physician's opinion."  Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995).

Here, the ALJ's credibility determination is complicated by her failure to even recognize Ms. Marso's degenerative disc disease, ankylosing spondylitis, and stroke as medically determinable impairments, and her failure to mention the records from Dr. Bustillo, who was treating Ms. Marso for her spine problems.  The Commissioner cites Wildman v. Astrue, 596 F.3d 959, 966 (8th Cir. 2010), for the proposition that the ALJ "is not required to discuss every piece of evidence submitted."  Id. (citing Black v. Apfel, 143 F.3d 383, 386 (8th

63

Cir. 1998)).  But in both <u>Wildman</u> and <u>Black</u>, the ALJ's written opinion failed to discuss a particular *opinion* held by the claimant's physician—the ALJ did not completely ignore the entire existence of the physician's records, or that a particular medical impairment alleged by the claimant existed at all.

Because the ALJ in this case failed to consider/mention Dr. Bustillo's records, and failed to discuss whether Ms. Marso's degenerative disc disease, ankylosing spondylitis, and stroke were in fact medically determinable impairments, the ALJ's credibility analysis is irreparably flawed.  For example, the ALJ discussed Ms. Marso's cervical epidural steroid injections from Dr. Mahaney in 2012 (AR19) and the fact that Ms. Marso reported 75% relief, but the ALJ failed to consider or discuss the effect of numerous records from Dr. Bustillo which note that, at or very near the same time, Ms. Marso reported to Dr. Bustillo that she had the "usual" discomfort in her back and had "chronic" back pain.  AR714-15.  And while the ALJ cited records in which Ms. Marso told Dr. Mahaney that the injections improved her pain, at the same time, she was telling Dr. Bustillo that she remained limited in her activities of daily living.  <u>See e.g.</u> AR691 (May, 2013 note from Dr. Bustillo wherein Ms. Marso reported "feeling better" but still having problems with laundry, cooking and shopping).   The logical conclusion is that, even with the noted improvement from the injections, Ms. Marso remained in enough pain that her abilities to engage in activities of daily living were significantly limited.

The ALJ relied primarily on only two factors to determine that Ms. Marso's subjective complaints were not entirely credible:  (1) her

medication in the form of the epidural steroid injections was effective in relieving her pain; and (2) her activities of daily living were incompatible with her pain complaints. But when Dr. Bustillo's records are considered, these conclusions are not supported by substantial evidence.

## F.    Type of Remand

This court has struggled mightily with deciding what type of remand is appropriate in this case. Ms. Marso is deceased. Because the copy of the death certificate which has been submitted by Ms. McCaskill indicates the primary causes of Ms. Marso's death were either the very impairments Ms. Marso alleged or with which the ALJ found Ms. Marso was afflicted (cardiomyopathy, lupus, Sjogren's syndrome, hypothyroidism, and stroke) it would seem appropriate to simply make a finding that Ms. Marso was in fact disabled and that she is therefore posthumously entitled to disability benefits. As such, it would seem the appropriate course of action to simply order remand with an instruction to the SSA to award benefits for the proper time frame. Indeed, this has been the course followed by many other courts faced with a similar set of facts. See e.g., Dyer v. Colvin, 9 F. Supp. 3d (D. Arizona 2014) (court found the ALJ's decision was not supported by substantial evidence, claimant was deceased, and court exercised its discretion to remand for an immediate award of benefits); Jones v. Astrue, 704 F. Supp. 2d 522 (D. S. Carolina 2010) (claimant died during pendency of appeal and cause of death was an impairment that the ALJ found not severe; court remanded for an award of benefits); Estate of Cormier v. Commissioner of Social Security, 2008

WL 4762882 at *6 (W.D. La. Oct. 27, 2008) (claimant died from the condition he claimed caused his disability the day after the Appeals Council denied review; court remanded for an award of benefits); <u>Berry v. Sullivan</u>, 761 F.Supp. 650 (E.D. Arkansas 1991) (claimant died from the condition she claimed caused her disability before ALJ hearing, claim was denied by the SSA but on appeal the court remanded for an award of benefits); <u>Abair v. Sec'y, Health and Human Services</u>, 590 F. Supp. 1062, 1067 (D. Mass. 1984) (remanding for reconsideration but bluntly instructing "the Secretary should take into consideration the fact that the plaintiff died of cardiopulmonary arrest on August 13, 1983 when he tried to do some work. Obviously, this evidence is material to plaintiff's claim of disability owing to a heart condition . . ."). Remand for an award of benefits is the course of action Ms. McCaskill asks of the court here because, she argues, the Commissioner's decision is not supported by substantial evidence and there simply is no more evidence which can be submitted.

Section 405(g) of Title 42 of the United States Code governs judicial review of final decisions made by the Commissioner of the Social Security Administration.  It authorizes two types of remand orders: (1) sentence four remands and (2) sentence six remands.  A sentence four remand authorizes the court to enter a judgment "affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).

A sentence four remand is proper when the district court makes a substantive ruling regarding the correctness of the Commissioner's decision and remands the case in accordance with such ruling.  Buckner v. Apfel, 213 F.3d 1006, 1010 (8th Cir. 2000).  A sentence six remand is authorized in only two situations: (1) where the Commissioner requests remand before answering the Complaint; and (2) where new and material evidence is presented that for good cause was not presented during the administrative proceedings.  Id. Neither sentence six situation applies here.

A sentence four remand is applicable in this case.  Remand with instructions to award benefits is appropriate "only if the record overwhelmingly supports such a finding."  Buckner, 213 F.3d at 1011.  In the face of a finding of an improper denial of benefits, but the absence of overwhelming evidence to support a disability finding by the court, out of proper deference to the ALJ the proper course is to remand for further administrative findings.  Id.; Cox v. Apfel, 160 F.3d 1203, 1210 (8th Cir. 1998).

After careful consideration, the court concludes reversal and remand is warranted because the evidence is overwhelming.  Taylor v. Barnhart, 425 F.3d 345, 356 (7th Cir. 2005) (an award of benefits by the court is appropriate only if all factual issues have been resolved and the record supports a finding of disability).  When one takes into consideration Dr. Bustillo's records, Ms. Marso's degenerative disease, ankylosing spondylitis, and stroke, as well as the functional limitations supported by these records and conditions, the conclusion Ms. Marso is disabled is inescapable.

## CONCLUSION

Based on the foregoing law, administrative record, and analysis, this magistrate judge hereby respectfully RECOMMENDS that the Commissioner's decision should be REVERSED and REMANDED for an award of benefits in accordance with this opinion.

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained. Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the District Court. Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

DATED April 20, 2018.

BY THE COURT:

VERONICA L. DUFFY
United States Magistrate Judge